UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSE ROSARIO, | ) | |
| Petitioner | ) | |
| v. | ) | Civil Action No. 12-12172-DJC |
| GARY RODEN et al., | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                         December 31, 2014

### I.    Introduction

Petitioner Jose Rosario ("Rosario") has filed a petition for a writ of habeas corpus ("Petition") pursuant to 28 U.S.C § 2254 alleging that the trial judge denied Rosario's right to due process. D. 1. Respondents oppose the Petition, arguing that Rosario has failed to show that the state-court adjudication of his claim was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. For the reasons set forth below, the Court DENIES Rosario's Petition.

### II.    Background

#### A.    Factual and Procedural History

*1.    Procedural History*

On June 4, 1999, Mario Cordova ("Cordova") was shot in Springfield, Massachusetts and died of his injuries on June 9, 1999. D. 1-4 at 7.[1] Alberto Montanez ("Montanez"), Felix

---

[1] All references to the record will be cited as follows: Rosario's Petition (D. 1); Rosario's Memorandum in Support of Petition (D. 27); and Respondents' Supplemental Answer ("Res. SA"). Respondents' Supplemental Answer includes Rosario's trial transcripts and motion

1

Padilla, Jr. ("Padilla"), Adrian Rivera ("Rivera"), Jason Rivas ("Rivas") and Jose Rosario were indicted as joint venturers in the murder. Id. at 8. Montanez and Rivera each entered into a cooperation agreement with the Commonwealth, testified in separate trials against Rivas and Rosario and pleaded guilty to manslaughter. Id.

On September 28, 2000, Rosario was convicted in Hampden Superior Court of murder in the first degree and sentenced to life in prison. Id. He appealed his conviction to the Supreme Judicial Court on October 27, 2000 and filed a motion for a new trial on October 22, 2001. Id. The Hampden Superior Court held an evidentiary hearing on Rosario's motion for a new trial in November 2002 and denied his motion on May 7, 2010. Id. Rosario appealed and that appeal was consolidated with his direct appeal before the Supreme Judicial Court, who affirmed both the conviction and the denial of the motion for a new trial. Id. On July 28, 2011, Rosario filed a petition for a rehearing, which the Supreme Judicial Court denied on September 9, 2011. Res. SA at 17. Rosario filed his petition for habeas corpus pursuant to 28 U.S.C. § 2254 on November 20, 2012. D. 1.

    2.  *Evidence Presented at Trial*

At trial, the Commonwealth presented the following evidence. Rosario was a "regional officer" in the street gang known as the Latin Kings. D. 1-4 at 8. Prior to the shooting, Rosario had three confrontations with the victim, Cordova, and his friend Johnel Olmo ("Olmo"), all involving allegations of stolen money and drugs from Rosario's apartment. Id. During the first incident, Rosario, in Cordova's presence, pointed a shotgun at Olmo's head and said that "there was going to be trouble" and that they "should pay the money." Id. During the second

---

hearing transcripts in a multi-volume document filed in hard copy only. The Court uses the shorthand "volume.page" to refer to the volume and page number. Volumes 1-13 contain the consecutive trial transcripts and volumes 14-16 contain transcripts from the hearing on Rosario's motion for a new trial.

encounter, Cordova and Olmo observed two vehicles, one belonging to Rosario, pull into a driveway. Id. A group of people exited the vehicles carrying weapons. Id. Olmo and Cordova ran into a nearby apartment and contacted the police, but Rosario left before the police arrived. Id. Finally, the third confrontation occurred when Rosario approached Olmo and Cordova in a bar, demanded his money and challenged Olmo to a fight. Id.

On the night of June 3, 1999, Jenette Vasquez ("Vasquez") invited Luis Rodriguez ("Rodriguez") and several other friends over her apartment in Springfield for dinner and a movie. Id. Vasquez invited Cordova and Olmo to the gathering, but before they arrived, Rosario stopped by the apartment. Id. at 8-9. While Rosario was still in the apartment, Olmo called Vasquez and asked to speak with him. Id. During the phone call, Rosario threatened Olmo saying, "I'm your worst nightmare." Id. After the phone call, Rosario left the apartment. Id. A short time later, Olmo and Cordova arrived at the apartment to watch the movie. Id.

That same night, Montanez, Padilla, Rivas and Rivera were all together at Rivera's house. Id. The four men were members of the Latin Kings and were subordinate in rank to Rosario. Id. Rosario called Padilla and told him to come pick him up and bring a gun from Rivera's house. Id. Rivas retrieved the handgun, and all four men left the house in Padilla's vehicle. Id.

Padilla picked up Rosario, who told the men about "a beef he had" with Olmo and Cordova. Id. Rosario told Padilla to go to Vasquez's apartment. Id. When they arrived, Rosario, Montanez and Rivas got out of the vehicle and Rosario told them to wait "between some buildings." Id. Rosario and Padilla then drove further down the street with the vehicle's headlights off. Id.

3

Cordova, Olmo, and Rodriguez left Vasquez's apartment when the movie was over, but Olmo returned to the apartment to use the bathroom. Id. Cordova and Rodriguez waited for Olmo near the entrance to the building. Id. While Cordova was standing in the doorway, Rosario and Padilla made a U-turn. Id. Rosario got out of the vehicle, ran over to Montanez and Rivas, pointed at Cordova and said, "Go, go, go." Id. At the same time, Rosario touched Rivas on the back and Rivas fired three shots at Cordova. Id. The first shot struck Cordova in the head and he fell to the ground. Id. Rosario, Montanez and Rivas returned to Padilla's vehicle and the men drove off. Id. Vasquez called 911 and Cordova was brought to the hospital, but he died six days later. Id.

### B. Relevant Proceedings in Superior Court

Rosario's trial began on September 14, 2000. Res. SA at 5. During the trial, Rodriguez testified that he was in Vazquez's apartment on the night Cordova was shot. Id. at 7.94. He testified that he left the apartment with Cordova and was waiting in the doorway with him when he was shot. Id. at 7.110-12. He and several other witnesses testified that Olmo and Rosario spoke on the phone that night. Id. at 6.97, 6.139-40, 7.60, 7.100. Rodriguez, Olmo, and Sharon Burgos ("Burgos") testified to some of the contents of that phone conversation, including that Rosario said to Olmo, "I am your worst nightmare." Id. at 6.139-40, 7.60, 7.100. Finally, Rodriguez and Olmo testified to seeing a black SUV outside of Vasquez's apartment that matched the description of the Suzuki Sidekick Padilla drove on the night Cordova was shot. Id. at 7.103-04, 6.153-55. Although Rodriguez was standing next to Cordova during the shooting, he was unable to identify the shooter. Id. at 7.136-37.

After Rodriguez testified, his attorney, Edward Fogarty ("Fogarty"), contacted the prosecutor, Donna Donato ("Donato"), to discuss the Commonwealth's sentencing

4

recommendation in an unrelated case pending against Rodriguez. Id. at 8.62-63. Rodriguez believed that Donato had agreed to consider his testimony when making a sentencing recommendation in that case. Id. at 8.88-89. The next morning, Donato disclosed the conversation to Rosario's attorney and the court, but denied that any cooperation agreement existed. D. 1-2 at 11.

After the disclosure, the trial judge held a hearing on the alleged cooperation agreement and called Rodriguez and Fogarty to testify. Id. at 11-12. Rodriguez testified that on April 27, 2000 he and Fogarty met with Donato. Res. SA at 8.86. Rodriguez testified that initially he was uncooperative but that he eventually decided to testify for the Commonwealth. Id. at 8.87. Rodriguez also testified that Donato had told him she could help him with his pending charges, but could not promise anything. Id. at 8.88. Fogarty corroborated Rodriguez's recollection of the discussions with Donato. Id. at 8.101-02. Fogarty also testified that the understanding was never reduced to writing and he had no other discussions with Donato about it. Id. at 8.102, 8.104. The court did not make any findings about the existence of an agreement, but offered to allow Rosario to recall Rodriguez to cross-examine him "to inquire whether Rodriguez believed that his testimony in the defendant's case would reduce the jail time that he was facing." Id. at 8.109; D. 1-2 at 12. Rosario's attorney requested that the judge allow him to recall Rodriguez and Fogarty and to present evidence of the delayed disclosure to the jury. Res. SA at 149. The court denied this request, but allowed Rosario's counsel, if he chose, to recall Rodriguez and question him about the alleged cooperation agreement. D. 1-2 at 12. Rosario's attorney declined to recall Rodriguez to the stand and moved for a mistrial, which the court denied. Id.; Res. SA at 6.

On September 28, 2000, Rosario was convicted and sentenced to life in prison. Res. SA at 7. While Rosario's direct appeal was pending, Fogarty located an unsigned letter in his files purporting to memorialize a cooperation agreement between Rodriguez and the Commonwealth. Res. SA at 460-61. Fogarty disclosed the letter to the Commonwealth and to Rosario's attorney. Id. at 463. Armed with this letter and other new evidence, Rosario filed a motion for a new trial, which was heard by the trial judge. Id. at 8.

During the hearing on Rosario's motion for a new trial, several witnesses testified, including Fogarty and Donato. Id. at 450. Fogarty testified, as he had during the trial, that he and Rodriguez met with Donato and during that meeting Donato assured them that Rodriguez would receive consideration for his cooperation with the Commonwealth. Id. at 454. He also testified that after he learned Rodriguez had testified in Rosario's case, he contacted Donato to discuss Rodriguez's pending charges. Id. at 454-55. Next, Fogarty testified that after Rosario's trial concluded, he reviewed his files and found a letter that he believed memorialized Rodriguez's agreement with the Commonwealth. Id. at 460. The letter had signature blocks for Donato, Rosario and Fogarty, but it was not signed. Id. at 277-78. He testified that after he discovered it, he sent it to Rosario's attorney and to the Commonwealth. Id. at 461. On cross-examination, the prosecutor questioned Fogarty about his prior testimony in the case. Id. at 470-71. The prosecutor pointed out that Fogarty testified at the hearing during the trial that there was nothing in writing. Id. Fogarty also testified that he did not know how or when he received the letter. Id. at 471-72. The prosecutor pointed out that the document mentioned the name of an

unrelated third party, Dianne Landers,[2] and Fogarty testified that he believed that it was a mistake. Id. at 473.

After Fogarty's testimony was complete, Donato was called to testify. Id. at 543. Donato testified that she did not offer anything to Rodriguez in exchange for his cooperation during their April 2000 meeting. Id. at 606. She also testified that she did not know who drafted the letter, when it was drafted or who sent it to Fogarty. Id. at 550-51. She speculated that her secretary may have drafted it before trial and that it may have been sent to Fogarty inadvertently. Id. Donato also claimed that it was her common practice to draft cooperation agreements when she had a reason to believe a witness might become uncooperative. Id. at 553. But she said that she did not ask anyone to send the letter to Fogarty. Id. at 554.

After reviewing the evidence, the judge denied Rosario's motion for a new trial. D. 1-2 at 15. In denying his motion, the judge found that Rodriguez was not a critical witness for the prosecution because his testimony was cumulative of other evidence presented at trial and Rodriguez did not place Rosario at the scene. Id. at 13. The court also found that the letter purporting to memorialize an agreement between Rodriguez and the Commonwealth did not corroborate the existence of a cooperation agreement, but that at most it corroborated a suggestion by Donato that a deal was possible. Id. In making this determination, the court noted that the letter was unsigned and that it contained the name of an unrelated third party. Id.

C. **Relevant Proceedings in the Supreme Judicial Court**

In his consolidated appeal, Rosario claimed that the trial judge erred in denying his motion for a new trial. Res. SA at 60-61. He claimed that the unsigned cooperation agreement

---

[2] The second page of the document contained the following language: "I certify that this Agreement letter has been read by Dianne Landers and that Dianne Landers understand it's [sic] terms." It also contained the language, "Attorney for Dianne Landers" beneath Fogarty's signature line on the second page.

7

bearing Fogarty's and Rodriguez's names was exculpatory material and that the prosecutor should have disclosed the letter prior to trial. Res. SA at 61-68. On appeal, the Supreme Judicial Court concluded that the judge did not abuse her discretion in denying Rosario's motion for a new trial. D. 1-4 at 15.

Rosario filed a petition for rehearing on July 28, 2011, which the Supreme Judicial Court denied on September 9, 2011. Res. SA at 17. Rosario filed his petition for habeas corpus on November 20, 2012. D. 1.

## III. Standard of Review

### A. Standard of Review in Habeas Cases

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim has been adjudicated on the merits in state court, this Court reviews a petition for writs of habeas corpus to determine if a state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This exacting standard is difficult to meet because "habeas corpus [only] is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 786 (2011) (internal citation omitted). Rosario contends that his claims were not adjudicated on the merits in state court and the Court should review his claims *de novo*. But for the reasons discussed below, this Court finds that the deferential standard of review required pursuant to 28 U.S.C. § 2254(d) applies.

When a state court has addressed a petitioner's claims on the merits, 28 U.S.C. § 2254(d)(1) provides two avenues to attack the state court's decision. A petitioner can argue that

it was "contrary to" or an "unreasonable application" of clearly established federal law as articulated by the Supreme Court. A state court adjudication is "contrary to" clearly established federal law when a state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or if a "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The petitioner has the burden to show that "the state court's application of clearly established federal law was objectively unreasonable." Id. at 410. Under this standard, the petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87.

In addition, a petitioner may challenge a state court's decision when it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). But factual determinations made by a state court "shall be presumed correct" and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. The Court Declines to Review Rosario's Claims De Novo**

In rare cases, where a state court has failed to address a petitioner's claims on the merits, this Court will review the petitioner's claims *de novo*. See Johnson v. Williams, __ U.S. __, 133 S. Ct. 1088, 1091 (2013). When, however, a petitioner raises a claim in state court, the court is

presumed to have addressed it on the merits. Richter, 131 S. Ct. at 784-85 (applying an on the merits presumption when a state court summarily rejects all of a petitioner's claims without discussion); Johnson, 133 S. Ct. at 1091 (applying the Richter presumption when a state court expressly addresses some but not all of a petitioner's claims). This "presumption is a strong one that may be rebutted only in unusual circumstances," but "it is not irrebuttable." Id. at 1097. Here, the Supreme Judicial Court did address the issue Rosario now presses in his petition and affirmed the reasoning of the Superior Court, finding no abuse of discretion. D. 1-4 at 15. Rosario concedes, as he must, that the Superior Court resolved his due process claims (affirmed by the Supreme Judicial Court) concerning the existence of any cooperation agreement between the Commonwealth and Rodriguez and the Commonwealth's delayed disclosure of same on the merits. D. 27 at 20. Rosario does contend, however, that the trial court failed to address the merits of his claim that his right to due process was violated by the court's refusal to permit him to offer evidence of the delayed disclosure to the jury. Id. In its opinion, the Superior Court discussed the Petitioner's request to introduce evidence of the delayed disclosure and his desire to challenge the prosecutor's integrity at trial. D. 1-2 at 14-15. The court noted that, as a remedy of the delayed disclosure, the trial judge afforded Rosario's counsel the opportunity to recall Rodriguez and cross-examine him about any cooperation agreement or any benefit that he expected to receive for his testimony, but defense counsel declined to do so. Id. The court also noted that Rosario failed to indicate how he would have restructured his cross-examination of Rodriguez or altered his preparation "so as to take advantage of the inference that Rodriguez was testifying in his own interest." Id. at 15.

Because, on this record, Rosario has failed to rebut the strong presumption that his claims were adjudicated on the merits in state court, this Court declines to review them *de novo* and will apply the deferential standard required by 28 U.S.C. § 2254(d).

## IV. Discussion

### A. The Trial Court's Factual Determinations Were Not Clearly Erroneous and an Evidentiary Hearing is Therefore Unnecessary

Rosario contends that the Superior Court's factual finding that the Commonwealth had not offered Rodriguez any consideration in exchange for his testimony was clearly erroneous. D. 1 at 12. This Court, however, concludes that Rosario has failed to meet his burden to show that those findings were clearly erroneous.

Factual determinations made the state court are "presumed to be correct" and Rosario has the burden of overcoming that presumption by providing "clear and convincing evidence." 28 U.S.C. 2254(e)(1). This presumption is applied to the state court's underlying findings of fact. Teti v. Bender, 507 F.3d 50, 58 (1st Cir. 2007) (citing Miller-El v. Cockrell, 537 U.S. 322, 341-42 (2003)).

In support of his contention, Rosario essentially restates the evidence presented to the state court. D. 1 13-14. His argument focuses on the credibility of the witness that testified before the trial court, but this is not sufficient to overcome the presumption that state court findings of fact are correct. In fact, "[d]escribing how different parties stated different versions of events does not constitute the needed showing of clear and convincing evidence" and the state court's implicit credibility determinations are "exactly the type of factual determinations to which [this Court defers], at least short of any indication of serious error." Teti, 507 F.3d at 59. Therefore, this Court finds that Rosario has failed to show that the state court's factfindings were clearly erroneous.

Finally, Rosario requests an evidentiary hearing on "facts related to his claim that the suppression of the letter cast doubt on the integrity of the investigation and prosecution." D. 27 at 24. He argues that the court implicitly found that the prosecution team had given deliberately false testimony concerning the cooperation agreement. Id. But the court made no such findings. In denying Rosario's motion for a new trial, the Superior Court found that the unsigned document did not corroborate the existence of a cooperation agreement. D. 1 Exh. A at 13. It found that, "at most, there was a suggestion by the ADA that a deal was possible." Id. The court did not, as Rosario contends, find that the prosecution gave false testimony; rather the court only concluded that, at best, the document could only corroborate a claim that the prosecutor suggested a deal was possible, it did not corroborate Rosario's claim that an agreement existed.

Because Rosario has failed to "allege sufficient facts to overcome AEDPA deference to the state court's factfindings and legal conclusion," this Court declines to hold an evidentiary hearing. Teti, 507 F.3d at 62.

### B. The Trial Court's Decision Addressing Rosario's Claims Was Not Contrary to Clearly Established Federal Law

Rosario raises two grounds in his petition: first, that "his Fourteenth Amendment right to due process was violated by the Commonwealth's suppression of the existence of a cooperation agreement between itself and Rodriguez" and "by its suppression of evidence supporting the existence of such an agreement," and second, that his right to due process was also violated when the trial court refused to permit him to present evidence of the delayed disclosure to the jury. D. 1 at 6-7. For the following reasons, the Court concludes that the state court adjudication did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

*1. Suppression of the Cooperation Agreement*

Rosario argues that the state court adjudication was contrary to clearly established federal law.[3] D. 27 at 20. He argues that the clearly established law applicable to his due process claims are Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985); and Kyles v. Whitley, 514 U.S. 419 (1995). In those cases, the Supreme Court held that a prosecutor has a duty to disclose material exculpatory evidence to the defense. Brady, 373 U.S. at 87; Bagley, 473 U.S. at 674; Kyles, 514 U.S. at 432. In Bagley, the Court disclaimed any distinction between exculpatory information and information that is only relevant for impeachment. Bagley, 473 U.S. at 683. The Court also held that evidence is material when there is a "reasonable probability that its disclosure would have produced a different result." Id. at 682. A reasonable probability of a different result is shown when the government's "suppression undermines confidence in the outcome of the trial." Id. at 678. Finally, in Kyles the Court held that courts must consider the cumulative effect of the nondisclosed evidence when evaluating its materiality and not each piece of evidence individually. Kyles, 514 U.S. at 441.

Rosario primarily relies on Kyles when he argues that the state court's decision was contrary to clearly established federal law. D. 27 at 20-21. Because a state court decision is only "contrary to" clearly established federal law when it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or reaches a different result on "materially indistinguishable facts from a relevant Supreme Court precedent," it is necessary to compare clearly established federal law with the law applied by the Superior Court. See Williams, 529 U.S. at 405.

---

[3] Although Rosario does not claim that the state court adjudication resulted in a decision that involved an unreasonable application of clearly established Supreme Court precedent, for the reasons stated herein, the Court concludes that the state court adjudication was neither contrary to clearly established federal law nor involved an unreasonable application of same.

13

Because Rosario does not claim that the facts of this case are materially indistinguishable from Kyles, this Court will only consider whether "the state court [applied] a rule that contradicts the governing law set forth in [the Supreme Court's] cases."[4] Williams, 529 U.S. at 405. Rosario, citing Williams v. Taylor, argues that the Superior Court applied a rule that contradicted the one set forth in Bagley and Kyles. D. 27 at 20. He argues that the state court applied the standard for materiality articulated in Commonwealth v. St. Germain, 381 Mass. 256 (1980), requiring a petitioner to show that timely disclosure of the evidence would have created "a reasonable doubt that would not have otherwise existed." Id. at 20-21. He further claims that the materiality standard from St. Germain was derived from the standard in United States v. Augurs, 427 U.S. 97 (1976), and the "Kyles court explained that this is not the same standard as Augurs." D. 27 at 21 (emphasis in original). But, Rosario's argument that the result reached by the Superior Court is "contrary to" clearly established federal law fails.

The Superior Court cited St. Germain for the proposition that, if the evidence was initially suppressed and then disclosed during trial, "it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence." D. 1-2 at 15. This standard is closely analogous to the federal standard. See United States v. Duval, 496 F.3d 64, 73 (1st Cir. 2007) (noting that "[w]hen the issue is one of delayed disclosure rather than of nondisclosure, however, the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case") (citation omitted). The court also cited to St. Germain when it made the further point that Rosario had failed to show how he would have altered the presentation of his defense "to take advantage of

---

[4] Even if the Court were to consider whether the facts here are "materially indistinguishable" from Kyles, this Court would conclude that they are distinguishable. As such, any claim that the Superior Court's decision was "contrary to" Supreme Court precedent because it reached an opposite result on "materially indistinguishable facts" is without merit.

14

the inference that Rodriguez was testifying in his own best interest" where counsel had chosen not to elicit such testimony when the court gave him leave to recall Rodriguez and do so. D. 1-2 at 15. Ultimately, the court concluded that additional evidence that Rodriguez believed he had a cooperation agreement with the Commonwealth did not warrant granting a new trial. Id. at 15.

The court cited to several other Massachusetts cases when it dispensed with Rodriguez's claims concerning the materiality of the alleged cooperation agreement. First, the court cited to Commonwealth v. Tucceri, 412 Mass. 401 (1992). Tucceri provides the standard for determining the materiality of nondisclosed information in the Commonwealth, and the Tucceri standard is more favorable to defendants than the standard required under Kyles and Bagley. See McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002) (en banc) (noting that there is no dispute that the state standard in Tucceri is more favorable to defendants than the federal constitutional standard). Since this standard is more favorable to the petitioner, it is presumed that the federal law adjudication is "subsumed within the state law adjudication." Id. The court also cited Commonwealth v. Hill, 432 Mass. 704 (2000). Hill involved the post-trial disclosure of a cooperation agreement between the Commonwealth and its key witness. There the court found the nondisclosed cooperation agreement material because it "could have affected the verdict." Hill, 432 Mass. at 716. This standard is at least as favorable to Rosario's claim as the reasonable probability of a different result standard required under Kyles and Bagley.

Nonetheless, Rosario contends that there was an agreement between the Commonwealth and Rodriguez and that the Commonwealth suppressed the existence of the agreement. D. 27 at 13. Furthermore, he contends that this alleged suppression, when coupled with other facts, undermines confidence both in the investigation of the murder and in Rosario's conviction. Id. First, he points out that Rodriguez made several statements to the police, but in each one key

facts were different. Specifically, Rosario notes that Rodriguez did not claim Rosario said "I'm your worst nightmare" to Olmo until his final statement to the police, but in earlier statements he did not mention the threat or claimed Rosario said something different. D. 27 at 14. Next, Rosario contends that his conviction was based "almost entirely on the testimony of two admitted participants [in the crime]." D. 27 at 15. He contends that Montanez's and Rivera's stories changed several times over the course of the investigation and that both men were given "substantial consideration" for their testimony. D. 27 at 16. He contends that these facts undermine confidence in Rosario's conviction and that the alleged suppression of the agreement, when considered in conjunction with these facts, is material. D. 27 at 13-14. These arguments, however, do not compel a different result here.

First, during the trial, his defense attorney questioned Rodriguez about the changes in his story, including what, if any, threats Rosario made to Olmo. Res. SA at 7.128-29. Second, the trial judge offered to let Rosario question Rodriguez about his expectation of a benefit from the government for his testimony. Rosario's attorney could have questioned Rodriguez about this matter and whether he had fabricated his story to get a deal. But Rosario's attorney declined to do so. Next, although other witnesses' stories changed throughout the course of the investigation none of this information was withheld from Rosario. In fact, his defense attorney cross examined them about the changes in their accounts. Id. at 8.166-167, 10.10-13.

Finally, Rosario contends that impeaching Rodriguez with the alleged cooperation agreement would have further undermined the credibility of other witnesses. D. 27 at 18. Although it is true that evidence impeaching one witness could undermine the credibility of another witness, See Kyles, 514 U.S. at 445 (noting that impeachment of one witness can undermine the testimony of other witnesses), the record does not suggest that is the case here.

16

First, Rosario's reliance on Kyles for support on this issue is misplaced. In Kyles, the Court discussed this issue in a very different context. In that case, the prosecution withheld statements made by its two key eyewitnesses that were inconsistent with the witnesses' trial testimony. Kyles, 514 U.S. at 442-44. Immediately after the incident, one witness told the police that he did not actually see the murder nor did he see the perpetrator outside of his vehicle. Id. But at trial, the witness said that he saw the perpetrator struggle with the victim, pull out a gun, and that he saw the shooting. Id. at 442. The prosecutor also suppressed statements made immediately after the shooting by another witness. Id. In the suppressed statement the witness provided a detailed physical description of the perpetrator, but that description did not match the defendant. Id. The Court said that the withheld statements seriously undermined the two witnesses' credibility. Id. at 444. Furthermore, because these two witnesses had the best view of the crime, their reduced credibility could impact the credibility of other witnesses who did not have as clear a view of the crime or the perpetrator. Id. at 445. By contrast, the evidence not disclosed here was the letter referencing the alleged cooperation agreement with Rodriguez. Prior to the end of the trial, however, defense counsel was already aware that Rodriguez believed he had made a deal with the prosecutor. Rosario could have undermined Rodriguez's credibility by cross examining him about this expectation of a benefit for his testimony, but he chose not to do so.

Under Brady and its progeny, material exculpatory evidence, including impeachment evidence, must be disclosed to the defense. Kyles, 514 U.S. at 432. Moreover, even if an agreement did exist (which the state court's finding that it did not has not been shown to be clearly erroneous), the disclosure of Rodriguez's belief that he had such an agreement was made during the trial and the defense was given an opportunity to bring this matter before the jury by recalling and cross examining him about it. Moreover, given the limits of the inculpatory nature

of Rodriguez's testimony (i.e., although Rodriguez provided evidence of Rosario's motive for the murder, he did not place him at the scene of the crime as others did), this Court does not conclude that there was "reasonable probability that its disclosure [or its earlier disclosure] would have produced a different result." See Bagley, 473 U.S. at 682.

For all of these reasons, this Court concludes that state court's adjudication did not result in a decision that was contrary to clearly established federal law or that constituted an unreasonable application of same.

### 2. Superior Court's Refusal to Allow Rosario to Elicit Testimony About the Timing of the Disclosure

Rosario contends, relying on Kyles, that the Superior Court's decision to deny him the ability to illicit testimony about the timing of the disclosure of the cooperation agreement and attack the integrity of the prosecution was contrary to clearly established federal law. D. 1 at 7; D. 27 at 21. Nothing, however, in Brady or its progeny requires a trial judge to allow a defendant to present evidence of a delayed disclosure to the jury in the specific manner that defense counsel requested as opposed to the remedy that the Superior Court allowed which was to cross examine Rodriguez about his belief about any cooperation agreement.

Rosario argues that under Kyles, he was entitled to present such evidence to the jury. But Kyles stops short of requiring trial judges to admit such evidence. In Kyles, the defendant's theory of the case was that the government's key witness had committed the crime and that the witness had framed him. Kyles, 514 U.S. at 429. The police became focused on Kyles only after the witness came forward and the witness lead the police to all of the evidence that incriminated Kyles. Id. at 424-29. The court found that the nondisclosed evidence in Kyles would have greatly strengthened the defendant's claim that he was framed by the government's key witness. Id. at 441. The court went on to say that Kyles's defense attorney could have used

the nondisclosed evidence to "good effect" when cross examining the police who investigated the crime because they failed to consider the witness's possible guilt and they tolerated, if not countenanced, "serious possibilities that incriminating evidence had been planted." Id. at 446.

The facts of this case, however, are distinguishable from those presented in Kyles. Here, unlike in Kyles, the only evidence at issue is an alleged cooperation agreement between the Commonwealth and Rodriguez. Furthermore, for the reasons articulated by the trial judge, Rodriguez was not a critical witness for the prosecution. Rodriguez did not testify that he saw Rosario commit the crime, and was not, as in Kyles, the key connection leading the investigation to Rosario. The evidence that Rosario alleges was suppressed did not, as in Kyles, undermine the thoroughness of the police investigation of the crime, but rather the credibility of Rodriguez's testimony but Rosario declined to question him about his belief about any cooperation agreement. Given that the court did not find an agreement existed and that the court offered Rosario the opportunity to cross-examine Rodriguez on the witness's belief that a cooperation agreement existed, the court was well within its discretion otherwise to limit Rosario's ability to introduce evidence of the matter before the jury.

## V. Conclusion

For the above reasons, the Court DENIES Rosario's petition for a writ of habeas corpus, D. 1.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge